## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **JAMES MICHAEL FLIPPO,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:05-0765** |
| | ) | |
| **THOMAS MCBRIDE, Warden,** | ) | |
| **Mount Olive Correctional Complex,** | ) | |
| **Respondent.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

On September 15, 2005, Michael James Flippo ("Flippo" or Petitioner), an inmate at Mount Olive Correctional Complex ("MOCC"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and an application to proceed *in Forma Pauperis* (Docket Nos. 1 and 2). On September 21, 2005, Flippo's petition and application were referred to the undersigned for proposed findings of fact and a recommendation ("PF&R") pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket No. 5). On October 17, 2005, the undersigned recommended the denial of Flippo's application to proceed *in Forma Pauperis* and, on November 11, 2005, Flippo paid the filing fee (Docket No. 13).

On August 29, 2006, the undersigned appointed Attorney Ira Mickenberg to represent Flippo in this proceeding (Docket Nos. 9, 20 and 21).[1] On October 16, 2006, the Respondent, Thomas L. McBride, filed a Motion to Dismiss for Failure to State a Claim and Motion for Summary Judgment and Memorandum in Support (Docket Nos. 23 and 24). On November 17, 2006, Mr. Flippo filed a Memorandum of Law in Support of his Petition for Writ of Habeas Corpus and in Opposition to

---

[1] Petitioner filed his § 2254 petition and *in Forma Pauperis* application *pro se*, and thus any documents filed before August 29, 2006, the date of Ira Mickenberg's appointment, will be construed liberally and held to a less stringent standard than if they were prepared by a lawyer. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

Respondent's Motion to Dismiss (Docket No. 27). On November 27, 2006, Respondent filed a Reply Memorandum in Support of his Motion to Dismiss or for Summary Judgment (Docket No. 28). Upon examination of the entire record in this case, the undersigned has determined that the State Court's decision did not result in a ruling that was contrary to, or involved an unreasonable application of, clearly established Federal law and **RECOMMENDS** that Respondent's Motion to Dismiss and for Summary Judgment (Docket No. 23) be **GRANTED** and Mr. Flippo's petition for *habeas* relief be **DENIED** (Docket No. 1).

> I.    **Background**

>> A.    Factual Background

In the early evening hours of April 29, 1996, Reverend James Michael Flippo and his wife, Cheryl, traveled to Babcock State Park in Fayette County, West Virginia, for an overnight stay.  At approximately 2:11 a.m. on the morning of April 30, 1996, the Fayette County 911 operator received an emergency phone call from Mr. Flippo.  During the call, Mr. Flippo stated that he and his wife had been attacked by a masked man in their cabin (Docket No. 23, Ex. 4 p.1-31; Docket No. 25, Ex. 4, 517:4-24 - 519:1-24).

The 911 operator told Flippo to remain at the pay phone while she arranged for help.  Deputy C. Bryant of the Fayette County Sheriff's Department responded to the emergency call and found Flippo at the pay phone with blood on his legs and wearing only his underwear (Docket No. 25, Ex. 4, 550:10-16).  Flippo told the deputy that he had traveled to the park in a green Cadillac, but that it had been stolen.  The deputy then drove Flippo to Cabin No. 13.  Upon their arrival, Deputy Bryant inquired about a red Camaro parked near the cabin.  Flippo stated that he did not know who owned the Camaro, and that he had not arrived at the park in a Camaro (Docket No. 25, Ex. 4, 553).

Deputy Bryant left Flippo in his police cruiser and walked over to the cabin. The deputy observed no signs of forced entry. (Docket No. 25, Ex. 4, 556-557). He was also careful to note that, although it had been raining and the ground was soft, he found no footprints (other than his own) around the cabin area (Docket No. 25, Ex. 4, 558:1-10). When the deputy entered the cabin, he found the dead body of Cheryl Flippo lying between the bed and the cabin wall (Docket No. 25, Ex. 4, 560:15-20). The deputy observed that Mrs. Flippo's skull was visible and that her brain matter was exposed.

After discovering the body, Deputy Bryant walked outside and found two paramedics on the scene. One paramedic went into the cabin, while the other tended to Mr. Flippo. Once the paramedic determined that Mrs. Flippo was dead, Mr. Flippo was taken to a local hospital. Deputy Bryant remained at the crime scene and conducted an investigation (Docket No. 25, Ex. 4, 565-567).

When Flippo arrived at the hospital, he presented with a bruise on his forehead and on the back of his head. He also had some scratches, with minimal bleeding, on his legs. (Docket No. 25, Ex. 4, 591-92). While Flippo received treatment, Fayette County Sheriff Detective S. Kessler arrived at the hospital. Flippo agreed to accompany the detective to police headquarters to give a statement when he finished receiving medical treatment (Docket No. 25, Ex. 4, 601-03).

While at police headquarters, Flippo informed the police that once he and his wife had settled into their cabin, he drove to a pay phone to call a sick friend at the hospital (Docket No. 23, Ex. 3, p.14-28). After making the call, he returned to the cabin and started a fire. He reported that he and his wife spent the evening playing cards, eating ice cream, and eventually retired to bed. Flippo stated that at some point after they went to bed, he awoke, heard a noise, and noticed an intruder in the cabin holding a rope and wearing a "toboggan" over his face. Id. Mr. Flippo further stated that before he could alert his wife, the intruder hit him on the back of his head with a piece of

3

firewood and knocked him unconscious. Id.  Mr. Flippo indicated that when he regained consciousness, he found the intruder sitting on him and cutting his legs with a knife.  The intruder struck him on the forehead again and knocked him unconscious for the second time.  Id. When Flippo regained consciousness, the intruder was gone. Flippo stated that he found his wife on the floor in a pool of blood, and ran from the cabin to locate a phone to call 911.  Id.

Shortly after Mr. Flippo gave his statement, Detective Kessler spoke by phone with a crime scene investigator, Detective G. Burke.  Detective Burke reported that there was no evidence of forced entry in the cabin, the crime scene looked staged, and that certain items were not where they logically should have been. After the telephone call, Flippo was informed that he was a suspect. (Docket No. 25, Ex. 4, 625:1-7).

On May 1, 1996, law enforcement officials showed Dr. Irvin M. Sopher, the Chief Medical Examiner for West Virginia and a board certified forensic pathologist, photographs of Flippo's injuries and explained Flippo's assertion that his injuries were inflicted by a third party.  (Docket No. 25, Ex. 23, 1601-02).  After reviewing the photos, Dr. Sopher suggested that he should meet with Flippo to conduct a physical examination (Docket No. 25, Ex. 23, 1602:5-10).  On May 2, 1996, Flippo arrived with his counsel at Dr. Sopher's office for a physical examination.  The examination lasted approximately one hour and Dr. Sopher took several photographs.  Id.

On May 3, 1996, the police arrested Mr. Flippo and charged him with the murder of his wife, Cheryl Flippo.  Flippo was subsequently indicted for first degree murder by a grand jury.  Prior to trial, Mr. Flippo moved to preclude the prosecutor from eliciting testimony that Flippo had a homosexual relationship with a Mr. Joel Boggess, a friend and member of Reverend Flippo's congregation.  The trial court granted the motion but permitted the prosecutor to present evidence

attempting to prove that Mr. Flippo's relationship with Mr. Boggess had strained the Flippo marriage.  The guilt phase of Flippo's trial began on October 14, 1997.

> B.    Procedural Background

On October 23, 1997, the jury returned a guilty verdict against Flippo for first degree murder. The following day, the jury heard evidence on sentencing and returned a verdict denying mercy. On November 3, 1997, the Trial Court sentenced Flippo to life in prison without mercy. On April 30, 1998, the Trial Court resentenced Flippo for the purposes of filing a timely appeal.

Flippo filed a petition to appeal his conviction with the Supreme Court of Appeals of West Virginia.  The Court summarily denied his appeal on January 13, 1999.  Flippo appealed the denial to the Supreme Court of the United States, which reversed and remanded his case on a Fourth Amendment issue regarding the lawfulness of the seizure of certain photographs found at the crime scene.  *See* Flippo v. West Virginia, 528 U.S. 11, 13 (1999).

On remand, the Trial Court issued a second order denying the motion to suppress and Flippo's motion for a new trial.  Flippo again appealed the Trial Court's decision. On November 22, 2002,  the West Virginia Supreme Court held that although the Trial Court erred by admitting the photographs, the error was harmless, and the Court affirmed Flippo's conviction.  State v. Flippo, 575 S.E.2d 170, 172 (W. Va. 2002).

On February 17, 2004, Flippo filed a petition for a writ of *habeas corpus* in the Circuit Court of Fayette County. On December 7, 2004, the Fayette County Circuit Court denied his petition. Flippo appealed the Circuit Court's denial to West Virginia's highest court, which declined to hear his case. This petition followed.

## II.    Standard of Review under Section 2254(d) of the AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a District Court may award *habeas corpus* relief on a claim that was adjudicated on its merits in State Court only if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. 2254(e)(1).

"A state court decision is contrary to clearly established federal law if the court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." Cummings v. Polk, 475 F.3d 230, 237 (4th Cir. 2007) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000) (internal quotations omitted)).  "A state court decision is an unreasonable application of federal law when it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  Williams, 529 U.S. at 407.  "A state court decision may also be an unreasonable application of federal law if it applies Supreme Court precedent in a different factual context from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a

6

context where such failure is unreasonable." <u>Cummings</u>, 475 F.3d at 237 (quoting <u>Robinson v. Polk</u>, 428 F.3d 350, 355 (4th Cir. 2006) (internal citation omitted)).

**III.   <u>Analysis</u>**

Petitioner asserts three claims for *habeas* relief.  His first two claims relate to the testimony of Dr. Irvine M. Sopher, the State's witness and the former Chief Medical Examiner for the State of West Virginia (Docket No. 25, Ex. 23, Tr. 1590:2-12).  Flippo's third claim alleges that his trial counsel, Attorney David Schles, provided ineffective assistance of counsel because he introduced the issue of Joel Boggess's sexual orientation during cross-examination, a subject that Mr. Schles had successfully precluded from evidence during pre- trial motions.

A.  <u>Introduction of "objectively untrue" testimony</u>

Flippo argues that the State Courts erred in denying his *habeas* petition because the admission of certain parts of Dr. Sopher's testimony violated Flippo's federal due process rights. Specifically, an important element of Flippo's defense involved his assertion that he was knocked unconscious when his wife's assailant struck him in the back of the head with a piece of firewood. At trial, Dr. Sopher testified that he examined the back of Flippo's head on May 2, 1996, two days after Cheryl's death, and "there was no injury whatsoever, no swelling of the scalp and no evidence of any impact at all.  So, of course, there was nothing to substantiate an impact that would cause unconsciousness" (Docket No. 25, Ex. 23, Tr. 1600:14-19; 1609:8-18).  Dr. Sopher also testified regarding several contusions and lacerations on Flippo's forehead and body, but his testimony regarding the injuries to the back of Flippo's head, and the potential impact of those injuries, form the crux of his due process claim.

7

Mr. Flippo asserts that Dr. Sopher's testimony was "objectively untrue" because he had "absolutely no scientific or factual basis" to conclude, following a "naked eye examination of the bruises on [] Flippo's head, whether [] Flippo had been unconscious days earlier" (Docket No. 27, p.12 ¶ 2). Flippo's opposition papers contain the statements of two physicians, Dr. Michael Gelbort and Dr. William Brown, who opine that a physician cannot conclusively determine whether a person has lost consciousness on the basis of a cursory physical examination (Docket No. 27, Exs. 1 and 2). Flippo argues that these statements demonstrate that Dr. Sopher's testimony regarding Flippo's alleged unconscious state during his wife's attack was false.

Mr. Flippo cites <u>United States. v. Napue</u>, 260 U.S. 264 (1959) and <u>United States v. Giglio</u>, 405 U.S. 150 (1972) in support of his argument that the admission of Dr. Sopher's testimony violated his federal due process rights. In <u>Napue</u>, the Supreme Court of the United States held that a conviction acquired through the knowing use of perjured testimony by the prosecution violated due process. Specifically, the petitioner in <u>Napue</u> claimed that an important State's witness had lied during his cross-examination when he stated that the Assistant State's Attorney had not promised to recommend a reduction of his sentence in return for his testimony, a response that the Assistant State's Attorney knew at the time to be false. 260 U.S. at 268. In addition, on re-direct, the Assistant State's Attorney himself elicited the false testimony, asking the witness if he (the Assistant State's Attorney) had promised him anything in return for his testimony. The witness again denied any promise of consideration, an answer that was not only untrue but known to be false by the prosecutor. <u>Napue</u>, 260 U.S. at 269-271.

The <u>Napue</u> Court reversed the petitioner's conviction. "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in

any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue, 260 U.S. at 269.

In a recent decision, the Court of Appeals for the Fourth Circuit further defined the components of a Napue claim. "Due process is implicated if the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected." Shuler v. Ozmint, 209 Fed. App'x 224, 232 (4th Cir. 2006) (citing Giglio, 405 U.S. at 153)). "The *knowing* use of false evidence or perjured testimony constitutes a due process violation when there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 91, 103 (1976) (emphasis added). A reasonable likelihood of a different result is shown when the government's act "undermines confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419 (1995).

Thus, as essential element of a Napue claim involves a wilful act or knowing omission by the State regarding the truthfulness of a witness's testimony. Specifically, Mr. Flippo must demonstrate that the State knowingly elicited Dr. Sopher's testimony about Flippo's injuries, and whether the physical manifestations of those injuries indicated a head trauma that would cause unconsciousness, knowing it to be false, or, that once Dr. Sopher testified to that end, the state knew Dr. Sopher's testimony was false and did nothing to correct it. Mr. Flippo has made no such showing here. In short, Mr. Flippo's assertion that Dr. Sopher had "absolutely no scientific or factual basis" to conclude that Mr. Flippo was not rendered unconscious during his wife's attack is

insufficient to demonstrate that the prosecution solicited Dr. Sopher's testimony knowing it to false

in an effort to obtain Flippo's conviction (Docket No. 27, p.12 ¶ 2).

> After considering Flippo's <u>Napue</u> claim at the State *habeas* level, the Trial Court concluded:

> [t]he Petitioner's characterization of Dr. Sopher's testimony as false or
> fabricated and that the State aided in the presentation of such evidence which
> the State knew to be false is wholly and utterly without any merit. For Dr.
> Sopher's trial testimony to be deemed false or a lie it would have to be
> conclusively shown that his trial testimony was totally and wholly different
> from what he truthfully and actually believed at the time he so testified. Such
> was not the case here.

(Docket No. 17, Ex. 2 p.55).

"A state court decision is an unreasonable application of federal law when it correctly

identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's

case." <u>Williams</u>, 529 U.S. at 407. Here, the State Court correctly identified the flaw in Flippo's

<u>Napue</u> claim, to wit, the absence of any evidence to suggest that the State knew that Dr. Sopher

would offer false testimony when questioned about the veracity of Flippo's alleged unconsciousness

during his wife's attack. In addition, there is nothing in the record to suggest that Dr. Sopher had

any reservations about the trustworthiness or reliability of his testimony.

In short, Mr. Flippo is confusing evidentiary weight with admissibility. Mr. Flippo was

entitled to offer his own expert witnesses to rebut Dr. Sopher's testimony and argue to the jury that

Dr. Sopher's physical examination of Flippo's head provided insufficient information to conclude

that Flippo was not unconscious at the time of the attack. Instead, Mr. Flippo chose to attack

Dr. Sopher's lack of expertise in the area of neurology. As the Trial Court noted in the underlying

State Court decision:

> Dr. Sopher, a well known and abundantly experienced forensic pathologist
> has an enormous amount of professional medical experience and training in

> finding, observing, examining and determining the extent and effect of a
> large variety of head injuries cause by a variety of blunt force or other
> trauma.  He is possessed of the same amount of professional experience in
> regard to bruises, abrasions, cuts, stab wounds, skin tears, skin rips and skin
> splits found of human bodies which have been attacked in various ways by
> various means.  He is clearly competent to testify as to the effect of such
> injuries on human bodies.

(Docket No. 17, Ex. 2, p.54).   The State Court's finding that Dr. Sopher was competent to testify

about Flippo's head injuries is a clear indication that the Trial Court concluded that the issue was

not whether the prosecution had offered known false testimony, but whether Dr. Sopher was

competent to testify about Flippo's physical injuries, and whether those injuries substantiated an

impact that would cause unconsciousness.  Dr. Sopher's opinion testimony is just that, medical

opinion testimony, and such testimony need not be irrefutable to be admissible.

Mr. Flippo's <u>Napue</u> claim is insufficient to trigger a federal due process violation.  Thus, the

undersigned agrees with the State *habeas* ruling, and finds that Mr. Flippo has failed to present a

viable <u>Napue</u> claim, and further concludes that the State Court decision did not result in a ruling that

was contrary to, or involved an unreasonable application of, clearly established Federal law.  28

U.S.C. § 2254(d).

B.  <u>Ineffective Assistance of Counsel</u>

In addition, Mr. Flippo argues that his trial counsel, Mr. Schles, was ineffective insofar as

he decided to elicit testimony about Joel Boggess's sexual orientation despite obtaining a favorable

pre-trial ruling that precluded the State from introducing evidence on the subject.

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the

familiar standard of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under this standard, two

prongs must be met:  (1) the petitioner must show that his counsel's performance "fell below an

objective standard of reasonableness," and (2) the petitioner must show that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." McNeill v. Polk, 476 F.3d 206, 208 (4th Cir. 2007).

Here, Mr. Flippo must overcome the presumption that Mr. Schles's decision to elicit testimony from Joel Boggess about his sexual orientation was based on sound trial strategy. Strickland, 466 U.S. at 389. The undersigned finds that he cannot. Specifically, during the State's direct examination of Joel Boggess, the prosecution raised questions regarding several overnight trips that Flippo and Boggess had taken together. (Docket No. 25, Ex. 22, Tr. 1516; 1522; 1525). On a number of these trips, Boggess testified that he and Flippo had shared a hotel room. Id. At the conclusion of the State's direct examination of Boggess, Mr. Schles approached Boggess for cross-examination, and began with the following question:

| | |
|---|---|
| Schles: | Joel, you know what's going on here, so I'm not going to beat around the bush. I want you to tell me, are you a homosexual? |
| Boggess: | No. |
| Schles: | Have you ever told anybody that you're a homosexual? |
| Boggess: | No. |
| Schles: | To the best of your knowledge, is Michael Flippo a homosexual? |
| Boggess: | No. |
| Schles: | Did you and Michael Flippo ever have a homosexual relationship? |
| Boggess: | No. |
| Schles: | Did Michael Flippo ever make a homosexual advance to you, ever? |
| Boggess: | Absolutely not. |
| Schles: | Did you ever make one at him? |
| Boggess: | Absolutely not. |

(Docket No. 25. Ex. 22, 1553:12-24; 1554:1-10).  The State Court found that Mr. Schles questioned Boggess about his sexual orientation during cross-examination because the State alluded to the issue by inference and innuendo, despite the defense's successful motion to exclude the topic.  In ruling that Mr. Schles made a tactical decision based on sound trial strategy, the State Court found the following:

> The strategic and tactical, trial decision of Petitioner's trial counsel to confront, head on, any thought in the jury's mind as to the existence of any improper relationship between Flippo and Boggess, was not, under the totality of the evidence existing in this case unreasonable, unsound or imprudent.  Trial counsel had the feel and sense, being present at the time, of the totality of the circumstances of the case, at that moment, being heard by the jury, and he, at that time, clearly and obviously made a strategic and tactical decision to put to rest any thoughts he felt might be lingering in the mind of the jury concerning Flippo's relationship with Joel Boggess.  The aforementioned was the Court's perception of trial counsel's conduct then and it remains unchanged.

(Docket No. 17, Ex. 2 p.57).  Thus, although defense counsel attempted to preclude evidence about an alleged homosexual relationship between Mr. Boggess and Mr. Flippo, the State nonetheless indirectly put the question of homosexuality before the jury by referencing Mr. Flippo's and Mr. Boggess' sleeping arrangements on several overnight trips.  It would be reasonable, therefore, for Mr. Schles to try to eradicate the jury's suspicions by asking Boggess directly about the relationship to dispel any questions concerning their homosexuality. The State Court's interpretation of Mr. Schles' conduct is supported by Mr. Schles' first question to Mr. Boggess on cross examination: "Joel, you know what's going on here, so I'm not going to beat around the bush, I want you to tell me, are you a homosexual?"  (Docket No. 25. Ex. 22, 1553:12-14). Mr. Schles was most likely referring to the state "beating around the bush" about Boggess's sexual orientation  In addition, Mr. Schles' questions elicited only exculpatory answers. Mr. Boggess unequivocally denied that he

was homosexual, denied being in a homosexual relationship with Mr. Flippo, and also testified that, to his knowledge, Mr. Flippo was not a homosexual (Docket No. 25. Ex. 22, 1553:12-24; 1554:1-10).

Again, "[a] state court decision is an unreasonable application of federal law when it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407.  In view of the deferential standard, the undersigned cannot find that the State Court unreasonably applied Strickland to the facts of Mr. Flippo's case. The undersigned agrees with the State *habeas* ruling and finds that Mr. Flippo has failed to present a colorable Strickland claim, and further concludes that the State Court's decision did not result in a ruling that was contrary to, or involved an unreasonable application of, clearly established Federal law.  28 U.S.C. § 2254(d).

### IV.  Proposal and Recommendation

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and conclude  that Respondent's Motion to Dismiss and Motion for Summary Judgment (Docket No. 23) should be **GRANTED** and Petitioner's Petition for Writ of Habeas Corpus should be **DENIED**. Unless, during the objection period described below, the Petitioner can demonstrate that his Petition should be granted, it is hereby respectfully **RECOMMENDED** that the District Court **GRANT** Respondent's Motion to Dismiss and Motion for Summary Judgment (Docket No. 23), **DISMISS** Mr. Flippo's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody (Docet No. 1) and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208 (1984).  Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record and to Petitioner.

Date: November 2, 2007.

R. Clarke VanDervort
United States Magistrate Judge

15